Filed 3/3/23  P. v. Pratt CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C094603 |
| Plaintiff and Respondent, | (Super. Ct. No. 19FE017389) |
| v. | |
| KEONDRE ALIJAH PRATT, | |
| Defendant and Appellant. | |

This case arises out of three gang-related shootings, one of which resulted in a death.  A jury found defendant Keondre Alijah Pratt guilty of assault with a semiautomatic firearm (Pen. Code, § 245, subd. (b); count one),[1] murder (§ 187, subd. (a); count three), and two counts of possession of a firearm by a felon (§ 29800, subd. (a)(1); counts two and four).  The jury also found true the firearm and gang enhancement

---

[1] Undesignated statutory references are to the Penal Code.

1

allegations (§§ 12022.5, subd. (a), 12022.53, subd. (d), 186.22, subd. (b)), and the special circumstance that defendant perpetrated the murder by intentionally discharging a firearm from a motor vehicle at a person outside the vehicle with the intent to inflict death (§ 190.2, subd. (21)). In a bifurcated proceeding, the trial court found defendant had a prior conviction that qualified as a serious felony (§ 667, subd. (a)) and a strike (§§ 667, subds. (b)-(i), 1170.12). The court sentenced defendant to life in prison without the possibility of parole for the murder, a consecutive 25 years to life for the firearm enhancement attached thereto, and a consecutive aggregate term of 55 years four months for the remaining charges and enhancements.

Defendant appeals, contending that reversal is required for a number of reasons, including evidentiary error, instructional errors, prosecutorial misconduct, a recent change in the law regarding the elements of a gang enhancement effectuated by Assembly Bill No. 333 (2021-2022 Reg. Sess.) (Assembly Bill No. 333), insufficiency of the evidence as to one of the firearm convictions, and sentencing errors. He further contends he is entitled to resentencing in light of recent changes to the determinate sentencing law effectuated by Senate Bill No. 567 (2021-2022 Reg. Sess.) (Senate Bill No. 567) and Assembly Bill No. 124 (2021-2022 Reg. Sess.) (Assembly Bill No. 124). Defendant also contends the matter must be remanded to allow the trial court to consider whether to exercise its discretion to impose a less severe firearm enhancement pursuant to *People v. Tirado* (2022) 12 Cal.5th 688. In a supplemental brief, defendant argues because Assembly Bill No. 333 requires bifurcation of the trial of gang enhancements from that of the underlying offenses, reversal is required.

We agree that defendant is entitled to resentencing given the recent changes in the determinate sentencing law, that one of his firearm convictions (count four) must be reversed for insufficiency of the evidence, and that the jury's true findings on the gang enhancements must be vacated. We will affirm the convictions on counts one, two, and three, vacate the sentence, and remand the matter to allow the prosecution the opportunity

2

to retry the gang enhancements under the current version of section 186.22, and for a full resentencing, where the trial court may reexamine all aspects of defendant's sentence in light of the changes to his judgment and consideration of new sentencing laws.

## FACTUAL BACKGROUND

The prosecution's theory was that defendant was a member of the Strawberry Manor Gangster Bloods (SMGB) criminal street gang, and that he was involved in three separate shootings over the course of a week in September 2019 involving members of rival criminal street gangs, the Del Paso Heights Bloods (DPHB) and the Stand-Up Boys (SUB).[2] Two of the shootings--the first and third--provided the basis for the charges in this case. Evidence of the second shooting in time was introduced as uncharged act evidence for the purpose of showing defendant's motive and intent to commit the charged offenses.

The defense theory was that defendant was not involved in any of the shootings; the critical issue at trial was identity. The defense did not dispute that defendant was a validated member of the SMGB, and there was no material dispute as to how the shootings were committed or that they were gang related. But the defense posited that other members of defendant's gang perpetrated the shootings. Defendant did not testify, and the defense offered no evidence.

At trial, a gang expert explained that the gangs involved in this case are African-American gangs, and that "[r]espect is everything in the gang culture"; it gives gang members status and can be obtained by committing crimes for the gang, promoting the gang (e.g., posting videos and photographs on social media), carrying a firearm, and disrespecting rival gang members (e.g., harming rivals, posting disparaging videos and photographs on social media). The expert also explained that the "atmosphere" with

---

[2] The SMGB is an "offshoot" of the DPHB. Both gangs identify with the color red.

3

respect to the SMGB and their rivals in September 2019 was "very violent."  There were numerous shootings and homicides from the year prior to September 2019 through the year after.

In view of the issues raised on appeal, we summarize only the pertinent facts. Additional information will be set forth, as necessary, in the Discussion section.

*The First Shooting--September 15, Assault with a Firearm*

Around 7:30 p.m. on September 15, 2019, police officers responded to a ShotSpotter alert of gunshots fired near the intersection of Fairfield Street and Eleanor Avenue in north Sacramento County.[3]  At the scene, 21 .40-caliber expended cartridge casings were found along Fairfield Street in two distinct groupings; the first grouping consisted of 16 casings spread out over approximately 25 yards near the Super X Market, while the second grouping consisted of five casings in an area to the north of the first grouping.  The location of the casings suggested there were two shooters, and that they were moving when the shots were fired.  The ShotSpotter activation also supported the conclusion that there were two shooters, as all of the gunshots were fired "pretty much in sequence."

Video surveillance footage from the Super X Market, which captured the area north of the market on Fairfield Street between Eleanor Avenue and Las Palmas Avenue, showed a speeding car crash into a black Ford Fusion.  The video also showed a person running north along Fairfield Street toward an apartment complex on Las Palmas Avenue (the Las Palmas complex).  Gunshots can be heard on the footage.

Video footage captured by a residential surveillance system showed a black car travelling south on Fairfield Street around the time of the shooting, and then two men running south on Fairfield Street, away from the Las Palmas complex.

---

[3] ShotSpotter is an acoustic gunshot detection system that alerts law enforcement to the area where gunshots may have been fired.

4

At the time of this shooting, the police were aware that a group of 10 to 20 young men, including defendant, gathered at the Las Palmas complex on a regular basis. The location of the shooting was considered "neutral territory," but was "[f]airly close" to the territory controlled by the SMGB and the DPHB.[4]

*The (Uncharged) Second Shooting--September 17*

On September 17, 2019, police were watching the Las Palmas apartment complex after learning a person affiliated with apartment number three might have been involved in the (first) shooting two days earlier. Around 4:00 p.m., officers saw defendant enter apartment number three. He was also seen getting in and out of a silver Chrysler sedan,[5] which was parked at the complex. Later that same day, defendant and another man went to the Super X Market in the Chrysler; defendant drove. When the men returned to the complex, they went inside apartment number three.

Around 7:30 p.m., witness S.C. heard gunshots and then saw a silver Chrysler sedan speed past his home. A police officer was dispatched to the area in response to a ShotSpotter alert of gunshots fired near that address. Upon his arrival, the officer spoke with the owner of the black Hummer parked in front of the residence. The owner's son (Cain) lived there and was a validated member of the DPHB.

A search of the area revealed four expended .40-caliber cartridge casings in the street, and a bullet hole in the driver's door of the Hummer. S.C. described the driver of the Chrysler as a "light-skinned" black man with a "small afro"; this broadly describes defendant, as we later explain.

---

[4] The territory of the respective gangs is "extremely close," only separated by a single street.

[5] At trial, the Chrysler was described as being silver, gray, blue, and silver/blue. In closing argument, defense counsel acknowledged that, depending on the lighting, the Chrysler looked silver, blue, or gray.

The next day, September 18, 2019, defendant was seen going in and out of apartment number three at the Las Palmas apartment complex.

*Events Following the Second Shooting*

On September 19, 2019, a police officer conducted a traffic stop of a black Ford Fusion less than a mile from the scene of the first shooting. The driver, Tyriece Washington, Sr., was the founder and a validated member of the SUB, which was affiliated with the DPHB and a rival of the SMGB. Upon questioning, Washington told the officer that a "young person" he did not know shot at him four days earlier in the area near Fairfield Street and Eleanor Avenue.[6] Washington also indicated that his moniker (i.e., nickname) was "OG Ty Bud." At trial, a gang expert explained that the more well known a gang member is, the "more of a target" that person is for rival gang members, as more status will be obtained by killing them.

On September 20, 2019, a police officer contacted defendant while he was sitting in the front passenger seat of the Chrysler, which was parked at the Las Palmas complex. The registered owner of the car (Cannon) was sitting in the passenger seat. During this encounter, there were approximately eight other people gathered in the area, including at least two members of the SMGB. The officer seized defendant's cell phone before leaving the area.

*The Third Shooting--September 21, Murder*

Around 3:45 p.m. on September 21, 2019, Syncere Dixon was shot and killed in a drive-by shooting near the intersection of Rio Linda Boulevard and North Avenue.

---

[6] Washington would not tell the officer details of the shooting, saying something to the effect of, "You know how it goes out here. I can't tell you what the person who shot [at] me looks like." At trial, a gang expert explained that, in gang culture, "snitching" (cooperating with law enforcement) is one of the worst things a gang member can do.

Dixon died of a gunshot wound to the right side of his chest. The wound was elongated, which suggested that the bullet passed through something else before it entered his body.

At the time of the shooting, Dixon was in the front passenger seat of a red Dodge sport utility vehicle (SUV) driven by Cain. The shooting occurred shortly after Cain and several other young males (including Dixon) left a high school that was located in the territory of the DPHB. Four of the young males in the Dodge (including Dixon and Cain) were members of the DPHB or affiliated with that gang.

At the scene of the shooting, which was in DPHB territory, 10 .40-caliber expended cartridge casings were found along North Avenue. There were multiple bullet strikes on the passenger side of the red Dodge SUV, and no bullet strikes on the driver's side.

Video footage captured by various surveillance systems showed a silver Chrysler sedan chasing a red Dodge SUV before the Chrysler accelerated and pulled up to the passenger side of the Dodge. The Chrysler drove toward the Las Palmas complex after the shooting.

An eyewitness to the shooting, L.N., told the police that the shooter was a skinny, "lighter-skinned" African-American man, with a "short fade" (short hairstyle). L.N. noted that she got a "quick" but "not a great" look at the shooter's face. She explained that the shooter was driving a blue four-door Chrysler sedan and sitting "low in his seat." She explained that the driver of the Chrysler pulled alongside a red car, put his arm out the window, fired multiple gunshots at the red car, and then continued driving. She estimated that the shooter was in his mid-20s.

L.N. was shown a photographic lineup that day and could not identify the shooter, but she identified defendant as one of three individuals in the lineup who she believed could have been the shooter. Approximately three weeks later, she participated in a recorded in-person lineup at the county jail and selected defendant, who was the only individual who appeared in both lineups. She selected him "just based on his skin

7

complexion" as "[i]t was kind of hard" because his "face was scrunched up." She said "maybe" defendant was the shooter, and that she "guess[ed]" defendant was the shooter, but did not identify him with certainty at that time.

At trial, L.N. explained that she only saw a "glimpse" of the shooter, and that she was primarily focused on the gun. But she testified that she was "very sure" defendant was the shooter when she identified him at the in-person lineup based on his complexion, although she later clarified that she identified defendant because he "looked familiar, . . . like the guy . . . [she] saw shooting," not "just because he was a lighter-skinned African American." When asked whether defendant was the person she saw shooting on September 21, 2019, L.N. said, "I think so."

L.N. explained at trial that, at the time of the shooting, she was in her driveway on North Avenue watching her niece and nephew play in a swimming pool. She was sitting in a chair with her back to the street. She heard two gunshots, and then quickly turned around and saw the driver of a blue car pointing a gun in the direction of a red car. When L.N. saw the gun, she immediately grabbed her niece and ran into her house.

Another eyewitness to the shooting, E.A., heard five or six gunshots and then ran into her house. As she was doing so, she looked in the direction of the gunshots and saw a red car and a silver or "bluish silver" four-door Chrysler car driving "really fast." The front windows of the Chrysler were down, and the back windows were up. She told law enforcement that the Chrysler contained a group of possibly three African-American men. The "silver car passed the red car, made a U-ey, [and] booked past the red car again."

At trial, E.A. confirmed that the "blue" Chrysler she saw on the day of the shooting was the same car that she and other witnesses described as being gray or silver.

*Other Evidence*

An image captured by a red light camera showed defendant driving the Chrysler on September 16, 2019. Cannon was in the front passenger seat.

8

On September 25, 2019, the Chrysler was impounded. On that same day, defendant and another man, Christopher Fuimano, were arrested. Based on information learned from Fuimano, a search was conducted at a residence on Tundra Way. During that search, a .40-caliber semiautomatic Glock, with a 15-round magazine, was found under a mattress. The gun was distinctive in that it had permanent discoloration on the slide. Given the capacity of the magazine, the gun was capable of firing 16 bullets.

A gang expert testified that gang members sometimes share guns.

A firearm expert determined that the .40-caliber expended cartridge casings found at the scene of the third shooting, as well as the group of 16 casings found at the scene of the first shooting, were fired from the gun found at Tundra Way. The group of five .40-caliber expended cartridge casings found at the scene of the first shooting as well as the casings found at the scene of the (uncharged) second shooting were fired by the same gun--an unknown, different .40-caliber "Glock type pistol."

A gunshot residue expert determined that particles associated with gunshot residue were located in various areas of the Chrysler, including on the front driver's side headliner, the gear shift, the steering wheel, the rear driver's side headliner, the rear driver's side door panel, the rear passenger side headliner, the rear passenger side door panel, and the front passenger side head rest.[7]

A search of defendant's cell phone revealed multiple photographs and videos of him holding a gun that looked similar to the gun found at Tundra Way, including videos made on September 16 and 19, 2019. There was also a video of what appeared to be defendant driving the Chrysler on September 17, 2019, and a video of defendant holding

---

[7] The expert explained that gunshot residue particles are a mixture of three main chemical elements. All three chemical elements were found on the front driver's side headliner, the rear passenger side headliner, and the rear passenger side door panel. The other areas of the car where particles of residue were found only had one or two of the chemical elements.

a gun and talking about killing rival gang members on July 12, 2018. Defendant's phone also contained photographs showing that he was near the area of the first shooting the day before it happened, and a video of him driving by the scene of the second shooting on August 12, 2019, while holding what appears to be the gun found at Tundra Way.

A search of defendant's Instagram account disclosed that, about 30 minutes after the first shooting, defendant posted a message reading: "Sum just happened. Might go down." Around 40 minutes later, he posted a message that he had to get "out of there" because he did not want to go to jail. Around 30 minutes later, he posted another message with a reference to getting "out of there with poles," which a detective explained is slang for guns.

Other videos and photographs obtained from defendant's Instagram account showed him promoting the SMGB and disrespecting the DPHB. In a video posted on September 21, 2019--the day of the third shooting--defendant is seen physically assaulting Daniel B., a member of the DPHB who had posted disrespectful things about the SMGB on social media. During the assault, which occurred in front of the Las Palmas complex, defendant stated, "Say that shit again" while his fellow gang members encouraged him. In connection with this video, defendant commented, "You soft ass. I was just waiting to catch you. Now they know the real you." There were also comments from other SMGB gang members praising defendant for the assault.

In a November 2019 jail call, defendant indicated that he had a problem with the driver of the red Dodge SUV (Cain). Defendant explained that they "got into it at the mall" and Cain texted him "some dumb shit" thereafter. In a subsequent jail phone call made in February 2020, defendant made a reference to Cain as a "bitch ass," who was "talkin' hella breezy and shit."

At trial, Cain denied that he knew defendant. However, the last two saved photographs in his cell phone, which was seized shortly after the third shooting, were

10

images of defendant taken on September 19, 2019. There were other photographs of defendant "throughout" Cain's phone.

## DISCUSSION

### I

### *Alleged Evidentiary Error*

Defendant contends the trial court prejudicially erred and also violated his constitutional rights by allowing the prosecution to introduce evidence of the uncharged assault of rival gang member Daniel B. As we next explain, we see no error in the court's decision that the assault was relevant to defendant's motive and intent to commit the charged offenses.

A. *Applicable Legal Principles*

Although evidence of an uncharged act is not admissible to establish a defendant's propensity to commit crime, it may be used for non-propensity purposes to prove a material fact at issue, including motive and intent to commit the charged offenses. (Evid. Code, § 1101, subd. (b); *People v. Cage* (2015) 62 Cal.4th 256, 273 (*Cage*).)

Motive is an intermediate fact that may be probative of such ultimate issues as intent or identity. (*People v. Lewis* (2001) 26 Cal.4th 334, 370; *People v. Demetrulias* (2006) 39 Cal.4th 1, 14; *People v. Clark* (2021) 62 Cal.App.5th 939, 960) "When the commission of the criminal *act* by a defendant is a disputed issue in an action, evidence that tends to prove that the defendant had a *motive* for committing the criminal *act* is deemed relevant evidence. 'Motive' is itself a state-of-mind or state-of-emotion fact. Evidence that tends to prove 'motive' meets the test of relevancy by virtue of the circumstantial-evidence-reasoning process that accepts as valid the principle that one tends to act in conformity with his state of mind or emotion." (*People v. De La Plane* (1979) 88 Cal.App.3d 223, 246, disapproved on another ground in *People v. Green* (1980) 27 Cal.3d 1, 39, fn. 25.)

11

"[E]vidence of motive makes the crime understandable and renders the inferences regarding defendant's intent more reasonable. 'Motive is not a matter whose existence the People must prove or whose nonexistence the defense must establish. [Citation.] Nonetheless, "[p]roof of the presence of motive is material as evidence tending to refute or support the presumption of innocence." ' " (*People v. Roldan* (2005) 35 Cal.4th 646, 707, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) "Although motive is not an element of . . . defendant's crime[ ], 'the absence of apparent motive may make proof of the essential elements less persuasive.' " (*People v. Davis* (2009) 46 Cal.4th 539, 604.)

Uncharged act evidence is admissible to establish two different types or categories of motive evidence. (*People v. Spector* (2011) 194 Cal.App.4th 1335, 1381.) As for the category that applies here, " 'the uncharged act evidences the existence of a motive, but the act does not supply the motive. . . . [T]he motive is the cause, and both the charged and uncharged acts are effects. *Both crimes are explainable as a result of the same motive.*' " (*Ibid.*)

When evidence of an uncharged act is offered to establish a defendant's motive and intent to commit the charged offenses, it may be admitted if there is " 'sufficient evidence for the jury to find defendant committed both sets of acts, and sufficient similarities to demonstrate that in each instance the perpetrator acted with the same intent or motive.' " (*People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 827; see *Cage, supra*, 62 Cal.4th at p. 274 [where uncharged act evidence is offered to establish motive, the "evidence may be dissimilar to the charged offenses provided there is a direct relationship or nexus between it and the current alleged crimes"]; *People v. Demetrulias, supra*, 39 Cal.4th at p. 15 [where uncharged act evidence is offered to establish intent, the charged offenses and the uncharged act need only be " 'sufficiently similar to support the inference that the defendant " 'probably harbor[ed] the same intent in each instance' " ' "].) An uncharged gang-related incident is relevant to establish motive and intent when

12

the charged offenses were committed under circumstances indicating they were gang related as well.  (See *People v. Zepeda* (2001) 87 Cal.App.4th 1183, 1212 [evidence of the defendant's involvement in an uncharged gang-related drive-by shooting was admissible to show the defendant's motive and intent in committing the charged crime of murder, as it "helped show that he likely committed the [charged] drive-by shooting for gang-related purposes"].)

Even if uncharged act evidence is admissible under Evidence Code section 1101, subdivision (b), it should be excluded under Evidence Code section 352 if its probative value is substantially outweighed by the probability that its admission will require undue consumption of time, confuse or mislead the jury, or pose a substantial risk of undue prejudice.  (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 406-407.) " ' " 'Prejudice' as contemplated by [Evid. Code] section 352 is not so sweeping as to include any evidence the opponent finds inconvenient.  Evidence is not prejudicial, as that term is used in [an Evid. Code] section 352 context, merely because it undermines the opponent's position or shores up that of the proponent.' " ' " (*People v. Scott* (2011) 52 Cal.4th 452, 490-491.)  " 'Evidence is prejudicial within the meaning of Evidence Code section 352 if it " 'uniquely tends to evoke an emotional bias against a party as an individual' " [citation] or if it would cause the jury to " ' "prejudg[e]" a person or cause on the basis of extraneous factors' " [citation].' [Citation.]" (*People v. Foster* (2010) 50 Cal.4th 1301, 1331; see *Scott*, at p. 491 ["evidence should be excluded as unduly prejudicial when it is of such nature as to inflame the emotions of the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish one side because of the jurors' emotional reaction"].)

We review a trial court's rulings on the admission of evidence under Evidence Code sections 1101 and 352 for abuse of discretion.  (*People v. Davis*, *supra*, 46 Cal.4th at p. 602.)

B. *Analysis*

We begin by acknowledging that the uncharged evidence of defendant's physical assault of a rival gang member was highly probative on the issues of motive, intent, and identity. "It is elementary, evidence of motive to commit an offense is evidence of the identity of the offender." (*People v. Daniels* (1971) 16 Cal.App.3d 36, 46.) Defendant's identity as the shooter was the sole contested issue at trial, and the prosecution attempted to establish identity largely by circumstantial evidence; hence, motive was highly material. (See *People v. Kovacich* (2011) 201 Cal.App.4th 863, 896 [evidence of motive is particularly material where the prosecution attempts to establish identity by circumstantial evidence].) In addition to its relevance as to the identity of the shooter, evidence of motive was also relevant to the issue of whether defendant intended to kill in connection with the third shooting. Both the uncharged act and the charged offenses were gang-related, involving acts of violence against rival gang members. The uncharged act evidence raised a reasonable inference that the first and third shootings were motivated by defendant's desire to seek out and do violence to rival gang members for gang-related purposes, including enhancing the reputation of his own gang and disrespecting a rival gang. The probative value of the uncharged act evidence was enhanced by the proximity of the physical assault in time and place to the first and third shootings; all three incidents occurred in the area near the Las Palmas complex, with the physical assault occurring on the same day as the third shooting, which occurred less than a week after the first shooting. (See *People v. Kipp* (1998) 18 Cal.4th 349, 371.) There was a direct nexus between the uncharged act and the charged offenses, and both sets of acts were sufficiently similar for the jury to infer that in each instance defendant acted with the same motive and intent.

We likewise disagree with defendant's contention that the trial court abused its discretion in refusing to exclude the uncharged act evidence as unduly prejudicial under Evidence Code section 352. " '[B]ecause a motive is ordinarily the incentive for criminal

14

behavior, its probative value generally exceeds its prejudicial effect, and wide latitude is permitted in admitting evidence of its existence.' " (*People v. Gonzalez* (2005) 126 Cal.App.4th 1539, 1550; *People v. Pertsoni* (1985) 172 Cal.App.3d 369, 375.) Although disturbing, the physical assault was not unduly prejudicial and "not significantly more inflammatory" than the charged crimes of murder and assault with a semiautomatic firearm. (See *People v. Kipp, supra*, 18 Cal.4th at p. 372; *People v. Eubanks* (2011) 53 Cal.4th 110, 144 [potential for prejudice is decreased when uncharged acts are no more inflammatory than the charged offenses].) We are similarly unpersuaded by defendant's contention that evidence of the physical assault should have been excluded because it was cumulative to the other evidence establishing his motive to commit the charged offenses.

Finally, because the trial court did not err in admitting the uncharged act evidence, we reject defendant's claim that the admission of this evidence violated his constitutional right to a fair trial. (*People v. Fuiava* (2012) 53 Cal.4th 622, 670.)

II

*Alleged Instructional Errors*

Defendant raises two claims of instructional error on appeal, which present questions of law we review de novo. (*People v. Mitchell* (2019) 7 Cal.5th 561, 579; *People v. Waidla* (2000) 22 Cal.4th 690, 733; *People v. Hernandez* (2013) 217 Cal.App.4th 559, 568.) As we next explain, we find no error.

A. *Flight Instruction*

Defendant initially contends the trial court prejudicially erred and also violated his constitutional rights by instructing the jury that it could consider flight from the scene in determining whether he was guilty of the charged offenses. He argues reversal is required because there was no evidence identifying him as one of the persons who fled from the scene of the first and third shootings. We disagree.

### 1. *Applicable Legal Principles*

In relevant part, CALCRIM No. 372 states: "If the defendant fled . . . immediately after the crime was committed . . . that conduct may show that . . . he . . . was aware of . . . his . . . guilt. If you conclude that the defendant fled[,] . . . it is up to you to decide the meaning and importance of that conduct. However, evidence that the defendant fled . . . cannot prove guilt by itself." "CALCRIM No. 372 is merely a distillation of the instructional duty imposed on the trial court by . . . section 1127c." (*People v. Pettigrew* (2021) 62 Cal.App.5th 477, 499.)[8]

A jury must be instructed on flight where there is evidence identifying the defendant as the person who fled the crime scene, and such evidence is relied upon by the prosecution as tending to show guilt. (*People v. Mason* (1991) 52 Cal.3d 909, 943 (*Mason*); *People v. Abilez* (2007) 41 Cal.4th 472, 521-522.) " 'A flight instruction is proper whenever evidence of the circumstances of [a] defendant's departure from the crime scene . . . logically permits an inference that his movement was motivated by guilty knowledge.' " (*Abilez*, at p. 522; see also *People v. Bonilla* (2007) 41 Cal.4th 313, 328.) Evidence that a defendant left the scene is not alone sufficient; instead, the circumstances of departure must suggest 'a purpose to avoid being observed or arrested.' [Citations.] To obtain the instruction, the prosecution need not prove the defendant in fact fled, i.e., departed the scene to avoid arrest, only that a jury *could* find the defendant fled and permissibly infer a consciousness of guilt from the evidence." (*Bonilla*, at p. 328.)

---

[8] Section 1127c provides: "In any criminal trial or proceeding where evidence of flight of a defendant is relied upon as tending to show guilt, the court shall instruct the jury substantially as follows: [¶] The flight of a person immediately after the commission of a crime, or after he is accused of a crime that has been committed, is not sufficient in itself to establish his guilt, but is a fact which, if proved, the jury may consider in deciding his guilt or innocence. The weight to which such circumstance is entitled is a matter for the jury to determine. [¶] No further instruction on the subject of flight need be given."

"[T]he facts of each case determine whether it is reasonable to infer that flight shows consciousness of guilt." (*Mason*, *supra*, 52 Cal.3d at p. 941.)

A flight instruction is proper if there is substantial evidence to support the instruction. (*People v. Richardson* (2008) 43 Cal.4th 959, 1020, superseded by statute on another ground as stated in *People v. Nieves* (2021) 11 Cal.5th 404, 509; *People v. Boyette* (2002) 29 Cal.4th 381, 438-439.) And the need for a flight instruction " 'does not change just because identity [of the perpetrator] is [a contested] issue. Instead, such a case [only] requires the jury to proceed logically by deciding first whether the [person who fled] was the defendant and then, if the answer is affirmative, how much weight to accord to flight in resolving the other issues bearing on guilt. The jury needs the instruction for the second step.' " (*Mason*, *supra*, 52 Cal.3d at p. 943; see *People v. Avila* (2009) 46 Cal.4th 680, 710 [flight instruction is proper even when identity is at issue].)

2. *Analysis*

We conclude the trial court properly instructed the jury on flight. The prosecution presented sufficient evidence that defendant was one of the people who fled the scene of the first and third shootings in a manner suggesting a purpose to avoid being observed and/or arrested, which rationally supported an inference that he was aware of his guilt. There is no dispute that the perpetrators involved in the shootings immediately left the scene. Nor is there a dispute that the shootings were gang related. The circumstances of how the perpetrators departed the scene of each shooting supported the prosecution's theory that the shooter(s) intended to kill the victims, who were rival gang members. Contrary to defendant's contention, there was ample evidence (as described in detail *ante*) from which a reasonable jury could have determined that he perpetrated the first and third shootings. In addition to the substantial compelling circumstantial evidence pointing to defendant as a shooter, including firearm evidence, an eyewitness to the third shooting identified him as the person who shot and killed Dixon.

17

We reject defendant's suggestion that CALCRIM No. 372, the pattern instruction on flight, improperly invited the jury to infer guilt, thereby violating his constitutional right to due process.  Courts, including our Supreme Court, have consistently rejected similar challenges to CALCRIM No. 372.  (See *People v. Pettigrew, supra,* 62 Cal.App.5th at pp. 501-502 [collecting cases]; see also *Cage, supra*, 62 Cal.4th at p. 286 [CALCRIM No. 372 " 'does not "create an unconstitutional permissive inference or lessen the prosecutor's burden of proof" ' "].)

B.  *Eyewitness Instruction*

Next, defendant contends his murder conviction must be reversed because the trial court prejudicially erred and also violated his constitutional rights by improperly instructing the jury to consider the level of certainty of an eyewitness's identification in evaluating the reliability of that identification.  We disagree.

1.  *Additional Background*

As detailed *ante*, there were three eyewitnesses to the third shooting, which resulted in the death of Dixon.  One of those witnesses, L.N., identified defendant as the shooter at an in-person lineup conducted approximately three weeks after the shooting. On cross-examination, L.N. acknowledged that she failed to identify defendant as the shooter from a photographic lineup on the day of the shooting, but claimed she was "very sure" defendant was the shooter when she subsequently identified him during the in-person lineup.  On recross-examination, L.N. clarified that she identified defendant as the shooter because he "looked familiar, . . . like the guy . . . [she] saw shooting," not "just because he was a lighter-skinned African American."

Prior to deliberations, the jury was instructed with CALCRIM No. 315 regarding evaluation of an eyewitness's testimony.  That instruction lists numerous factors for the jurors to consider in determining "whether an eyewitness gave truthful and accurate testimony," including the following:  "How certain was the witness when he or she made an identification?"  (See CALCRIM No. 315.)

18

## 2. *Analysis*

As an initial matter, we conclude that defendant's claim is forfeited because he failed to object to the challenged instruction or request that it be modified to omit the certainty factor. (*People v. Sanchez* (2016) 63 Cal.4th 411, 461 [failure to request eyewitness identification instruction be modified to omit certainty factor results in forfeiture of appellate claim of instructional error].) Given the evidence adduced at trial, it is unclear that defendant would have *wanted* omission of that factor; indeed, there were tactical reasons for the defense to want it given. As we have described, there was evidence that called into question the certainty of L.N.'s identification of defendant.

In any event, we conclude the claim fails on the merits. Defendant contends CALCRIM No. 315 deprived him of due process by "skewing [the] jury's function to assess witness credibility," and by "creating a procedure that gives an unfair advantage to the prosecution and interferes with [a] defendant's ability to secure a fair trial." However, as defendant acknowledges, our Supreme Court recently concluded that the version of CALCRIM No. 315 given to the jury in this case does not, by itself, violate a defendant's due process rights by lowering the prosecution's burden of proof or by depriving the defendant of a meaningful opportunity to present a defense. (See *People v. Lemcke* (2021) 11 Cal.5th 644, 646-647, 657, 660-661 (*Lemcke*).) In *Lemcke*, the high court held that a due process violation occurs only if the instruction--" ' "in the context of the instructions as a whole and the trial record" ' "--renders the defendant's trial fundamentally unfair. (*Id*. at p. 661.)

Despite the absence of a due process violation, the *Lemcke* court exercised its supervisory powers to direct trial courts to omit the certainty factor from the instruction until the Judicial Council had the opportunity to consider modifying the language to minimize juror confusion on this issue, unless the defendant requested otherwise. (*Lemcke*, *supra*, 11 Cal.5th at pp. 647-648, 669.) The *Lemcke* court also observed that the instruction did not correct the common misconception that a witness's high degree of

19

certainty in an identification correlates to accuracy. (*Id.* at pp. 647, 666.) Rather, by "merely directing the jury to consider a witness's level of certainty, without any further caveats, [the instruction] effectively operates to reinforce that misconception." (*Id.* at p. 666.) This is especially problematic in cases like Lemcke's, where the conviction was based almost entirely on the testimony of a single witness who expressed certainty in her identification and had no prior relationship with the defendant. (*Id.* at pp. 647, 665-666.)

Although the *Lemcke* decision was issued about a month before the jury returned its verdicts in this case, the trial court did not omit the certainty factor from the CALCRIM No. 315 instruction, and it was not asked to do so by the defense. On appeal, defendant makes no effort to show a due process violation under the standard articulated in *Lemcke*. Instead, he generally insists that there was a due process violation, even though he acknowledges that we are bound by our Supreme Court's holding in *Lemcke*. And defendant does not identify any restriction on his opportunity to present a defense on the issue of identity. While it is true that part of the defense in *Lemcke* involved a defense eyewitness expert (*Lemcke, supra*, 11 Cal.5th at pp. 647, 650-652), nothing prevented defendant here from producing such an expert as part of his defense. Further, defendant had the opportunity to cross-examine L.N. and the investigating officers regarding her identification of defendant as the shooter and the procedures used during the lineups. And, unlike in *Lemcke*, defendant's murder conviction was not primarily based on the testimony of a single witness.

Because defendant has not shown that instructing the jury on witness certainty rendered his trial fundamentally unfair, we treat any instructional error as a violation of state law subject to the harmless error standard set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836. (See *People v. Ward* (2005) 36 Cal.4th 186, 214 [applying *Watson* standard to claim that the pattern instruction regarding an eyewitness's level of certainty was erroneous].) Thus, "reversal is required if it is reasonably probable the result would have been more favorable to the defendant had the error not occurred." (*People v. Guiton*

20

(1993) 4 Cal.4th 1116, 1130.)  In determining whether there was prejudice, we examine the entire record.  (*Ibid*.)

Viewing the record as a whole, including the substantial evidence pointing to defendant as Dixon's killer, we see no prejudice from the asserted instructional error. The challenged instruction cited the certainty factor in a neutral manner and did not suggest that certainty equals accuracy.  The instruction told the jury to consider a large number of different factors in evaluating whether L.N.'s identification was trustworthy. (See CALCRIM No. 315.)  The trial court instructed the jury to evaluate all of these factors against a backdrop of additional instructions:  "People sometimes honestly forget things or make mistakes about what they remember"; "You must decide what the facts are"; "You alone must judge the credibility and believability of the witnesses"; "You may believe all, part, or none of any witness's testimony"; that defendant "is presumed to be innocent"; and that, "[u]nless the evidence proves the defendant guilty beyond a reasonable doubt, he is entitled to an acquittal and you must find him not guilty." (CALCRIM Nos. 200, 220, 226, 315.)

By drawing the jury's attention to L.N.'s level of certainty in identifying defendant as the shooter, the challenged instruction served to highlight the *deficiencies* in her identification that were revealed at trial and pointed out by defense counsel during closing argument.  With respect to the Dixon shooting, defense counsel focused her closing argument on the eyewitness factors listed in CALCRIM No. 315.  As for L.N., defense counsel initially noted that L.N. acknowledged she did not "really see [the shooter's] face," as she was focused on the gun and immediately ran inside her home after grabbing her niece and nephew.  Defense counsel also noted that L.N. was in a stressful, shocking situation and not in a position to get a "clear view of what happened," as she was behind a vehicle or in between two vehicles at the time of the shooting. Further, defense counsel pointed out that L.N. is not the same race as the shooter, she only gave a general description of the shooter that was not consistent with what defendant

21

looked like on the day of the shooting, she failed to identify defendant in the photographic lineup on the day of the shooting, and she only identified defendant at the in-person lineup three weeks later based on his "skin complexion" and because he "look[ed] familiar." Defense counsel argued that L.N.'s in-person identification was influenced by the fact that defendant was the only person in both lineups, and urged the jury to reject L.N.'s identification as insufficient to support a finding of guilt because it was not a "true identification," but rather a "tentative [identification] at best."

For his part, the prosecutor did not argue that L.N. was certain or highly confident in her identification of defendant as the shooter. Instead, the prosecutor acknowledged that L.N. did not see the shooter's face "for a long time" and that, according to L.N., his face was "scrunched up at time of the shooting." The prosecutor acknowledged that L.N. failed to identify defendant as the shooter from a photographic lineup on the day of the shooting. The prosecutor noted that L.N. identified defendant during the in-person lineup because he "looked familiar," and urged the jury to watch the video recording of L.N.'s identification.

Under the circumstances presented, we are convinced that it is not reasonably probable defendant would have obtained a more favorable outcome absent the asserted instructional error.[9] In light of this conclusion, we need not and do consider defendant's

---

[9] We are unpersuaded by defendant's suggestion that E.A.'s identification of the Chrysler as the car the shooter was driving implicates the *Lemcke* court's concerns about CALCRIM No. 315's certainty factor. At no point did E.A. express a degree of certainty about her identification. She was not asked whether she was certain about her identification, and did not volunteer that she was. When she was shown a picture of the Chrysler at trial, she indicated that it "look[ed] familiar," and that she "could tell it was the same car" she saw on the day of the shooting because it was the same color, a Chrysler, and "pretty distinctive from the body of it." However, she acknowledged that there was nothing particularly distinctive about the car she saw, such as scratches or "spinning wheels," and that the type of car she saw was not "rare." In short, nothing in the record supports the conclusion that E.A. was certain in her identification. In any

alternative contention that his trial counsel was ineffective for failing to object to the challenged instruction or request it be modified to omit the certainty factor.

III

*Alleged Prosecutorial Misconduct*

Defendant contends the prosecutor committed prejudicial misconduct by making comments in rebuttal closing argument that reduced or trivialized the reasonable doubt standard. Anticipating that he may have forfeited this claim by failing to object in the trial court, defendant alternatively argues his trial counsel was ineffective. We see no basis for reversal.

A. *Additional Background*

Prior to closing argument, the trial court orally instructed the jury pursuant to CALCRIM No. 220. The jury was told that defendant was presumed innocent, and that this presumption required the prosecution to prove defendant was guilty of the charges beyond a reasonable doubt. The court gave the jury the standard definition of reasonable doubt: "Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true. The evidence need not eliminate all possible doubt because everything in life is open to some possible or imaginary doubt." (See CALCRIM No. 220.)

In closing, the prosecutor did not define or attempt to explain the reasonable doubt standard in his initial argument to the jury. Instead, he discussed the evidence and argued that defendant should be found guilty as charged because there was sufficient evidence to satisfy the reasonable doubt standard. At the outset of her closing argument, defense

---

event, we see no prejudice resulting from the trial court's failure to omit the certainty factor from the CALCRIM No 315 instruction. As we have discussed, there was substantial compelling evidence connecting defendant to the Chrysler and the murder of Dixon. E.A.'s testimony was not the only--or even the strongest--evidence that defendant was the person who shot and killed Dixon.

counsel reminded the jury of the presumption of innocence and that the prosecution had the burden to prove the charges beyond a reasonable doubt. Defense counsel also read the first sentence of the standard definition of reasonable doubt as set forth in CALCRIM No. 220. Immediately thereafter, defense counsel explained that an abiding conviction means a "long-lasting conviction," one that is "enduring," and argued that the jury must return not guilty verdicts if this standard was not met. In her final remarks to the jury, defense counsel reminded the jurors that they must have "an abiding conviction" that a charge is true to return a guilty verdict, which meant that the jurors must be sure that a guilty verdict is "the right decision not only today, but tomorrow, next month, next year, next decade."

In rebuttal closing argument, the prosecutor argued that the evidence, including the evidence of motive, supported a finding that he was guilty as charged. In his concluding remarks to the jury, the prosecutor urged the jurors to consider "the universe of the evidence together," including all of the circumstantial evidence connecting defendant to the charged offenses, and then stated:

"Let's call one track the gun. Let's call one track the car. Let's call one track the motive. All these tracks are leading you towards the defendant.

"Every single one, every single one. And the defense is standing in the middle pointing you to the left. Which way are you going to go? To the right. Because that's the only reasonable interpretation of this evidence.

"*Proof beyond a reasonable doubt. Yes, we have it here. It's met across this state like defense said, across the city. Every day in this courthouse it's met. It's not unattainable. You have it here*.

"This case has been proven beyond a reasonable doubt, and it's now time for you to hold the defendant accountable. Return those verdicts. This is conduct that needs to be checked, that cannot go unchecked in this county. Thank you."

24

Prior to deliberations, the jury was provided a packet of written instructions, which included CALCRIM No. 220.

B. *Applicable Legal Principles*

1. *Beyond a Reasonable Doubt Standard*

"Under the due process clauses of the Fifth and Fourteenth Amendments, the prosecution must prove a defendant's guilt of a criminal offense beyond a reasonable doubt, and a trial court must so inform the jury." (*People v. Aranda* (2012) 55 Cal.4th 342, 356.) Proof beyond a reasonable doubt requires "a subjective state of near certitude" about the accused's guilt. (*Jackson v. Virginia* (1979) 443 U.S. 307, 315.) California law defines reasonable doubt as follows: " 'It is not a mere possible doubt; because everything relating to human affairs is open to some possible or imaginary doubt. It is that state of the case, which, after the entire comparison and consideration of all the evidence, leaves the minds of jurors in that condition that they cannot say they feel an abiding conviction of the truth of the charge.' " (§ 1096.)

CALCRIM No. 220 describes proof beyond a reasonable doubt as "proof that leaves you with an abiding conviction that the charge is true. The evidence need not eliminate all possible doubt because everything in life is open to some possible or imaginary doubt." In *People v. Zepeda* (2008) 167 Cal.App.4th 25, a panel of this court explained that "[t]he modifier 'abiding' informs the juror his conviction of guilt must be more than a strong and convincing belief. Use of the term 'abiding' tells the juror his conviction must be of a 'lasting, permanent nature,' it informs him 'as to how strongly and *deeply* his conviction must be *held*.' " (*Id*. at pp. 30-31 [finding the "phrase, 'proof that leaves *you* with an abiding conviction that the charge is true,' unmistakably conveys the conviction's subjective nature and the very high level of certainty required"].)

"The United States Supreme Court and the California Supreme Court, respectively, have described 'an abiding conviction' as one that is 'settled and fixed'

[citation] and one that is 'lasting [and] permanent' [citation]." (*People v. Pierce* (2009) 172 Cal.App.4th 567, 573.)

### 2. *Prosecutorial Misconduct*

" ' "A prosecutor who uses deceptive or reprehensible methods to persuade the jury commits misconduct, and such actions require reversal under the federal Constitution when they infect the trial with such ' "unfairness as to make the resulting conviction a denial of due process." ' " ' [Citations.] ' "Under state law, a prosecutor who uses such methods commits misconduct even when those actions do not result in a fundamentally unfair trial." ' [Citations.] . . . Prosecutorial misconduct can result in reversal under state law if there was a 'reasonable likelihood of a more favorable verdict in the absence of the challenged conduct' and under federal law if the misconduct was not 'harmless beyond a reasonable doubt.' " (*People v. Rivera* (2019) 7 Cal.5th 306, 333-334.)

A prosecutor commits misconduct if he or she misstates the applicable law. (*People v. Boyette*, *supra*, 29 Cal.4th at p. 435; *People v. Cortez* (2016) 63 Cal.4th 101, 130.) To prevail on a claim of prosecutorial misconduct based on remarks to the jury, a defendant must show that, " ' "[i]n the context of the whole argument and the instructions" [citation], there was "a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner.' [Citation.] If the challenged comments, viewed in context, 'would have been taken by a juror to state or imply nothing harmful, [then] they obviously cannot be deemed objectionable.' " ' " (*Cortez*, at p. 130.)

" 'As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety.' " (*People v. Prieto* (2003) 30 Cal.4th 226, 259; see also *People v. Tully* (2012) 54 Cal.4th 952, 1010.) " 'The primary purpose of the requirement that a defendant object at trial to argument constituting prosecutorial misconduct is to give the

trial court an opportunity, through admonition of the jury, to correct any error and mitigate any prejudice.' " (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1328.) The general forfeiture rule is subject to two exceptions. A claim of prosecutorial misconduct is reviewable on appeal, absent an objection and request for an admonition, if an objection and/or a request for admonition would have been futile or an admonition would not have cured the harm caused by the misconduct. (*People v. Hill* (1998) 17 Cal.4th 800, 820.)

C. *Analysis*

As an initial matter, we conclude that defendant has forfeited his prosecutorial misconduct claim. He never raised the issue of misconduct or asked the trial court to admonish the jury to disregard any impropriety on the part of the prosecutor. On appeal, defendant does not argue that an objection and/or a request for admonition would have been futile or that an admonition would not have cured any harm from the challenged remarks. However, because defendant also argues ineffective assistance of counsel, we briefly reach the merits of defendant's claim and conclude it fails.

The prosecutor did not improperly trivialize the reasonable doubt standard or otherwise misstate the law in rebuttal closing argument as to the burden of proof. Instead, the prosecutor simply noted that it is not impossible for the standard to be met, and argued it was satisfied in this case. In doing so, the prosecutor made the unremarkable point that prosecutors in Sacramento and across the state satisfy the burden on a daily basis. We conclude that, when the entire argument and the instructions are examined, it is not reasonably likely the jury understood or applied the disputed remarks in an improper or erroneous manner.

We are unpersuaded by defendant's contention that the jury likely understood the challenged remarks as an invitation by the prosecutor to consider defendant's status as a criminal defendant as evidence tending to prove his guilt. The trial court properly defined the reasonable doubt standard in both the oral and written instructions given to

27

the jury. As part of those instructions, the jurors were specifically told that defendant was presumed innocent, the fact that criminal charges had been filed against defendant was not evidence the charges were true, and that they must not be biased against defendant just because he had been arrested, charged with crimes, and brought to trial. (CALCRIM No. 220.) The jury was instructed to ignore any of the attorney's comments that conflicted with the law stated in the trial court's instructions. (See CALCRIM No. 200.) We presume the jury understood and followed these instructions. (*People v. McKinnon* (2011) 52 Cal.4th 610, 670.)

Finally, contrary to defendant's contention, the challenged remarks did not reduce the prosecutor's burden to prove the charges beyond a reasonable doubt. The prosecutor did not, as defendant suggests, imply that the jurors could convict defendant if they had less than an abiding conviction the charges were true. Moreover, as noted *ante*, the jury was properly instructed on the prosecution's burden of proof. Multiple instructions informed the jury as to the prosecution's burden of proof. (See, e.g., CALCRIM Nos. 220 [reasonable doubt], 315 [eyewitness identification], 359 [corpus delicti], 520 [murder].) And defense counsel emphasized the court's instructions on the presumption of innocence and reasonable doubt in closing argument, including reading the first sentence of the standard definition of reasonable doubt to the jury. Counsel argued an abiding conviction means a "long-lasting conviction," one that is "enduring." In her final remarks to the jury, counsel reminded the jurors that they must have "an abiding conviction" that the charges are true to return a guilty verdict, which meant that the jurors must be sure that a guilty verdict is "the right decision not only today, but tomorrow, next month, next year, next decade." The prosecutor said nothing to contradict this assertion.

Even if we were to assume misconduct, defendant suffered no prejudice from the brief and isolated remarks challenged on appeal. In light of these conclusions, we need not and do not address defendant's alternative contention that his trial counsel was ineffective for failing to object to the remarks.

IV

*Assembly Bill No. 333*

Effective January 1, 2022, Assembly Bill No. 333 made significant modifications to the substantive and procedural requirements for establishing a gang enhancement under section 186.22. (See *People v. Tran* (2022) 13 Cal.5th 1169, 1206 (*Tran*); *People v. E.H.* (2022) 75 Cal.App.5th 467, 477-478 (*E.H.*); Stats. 2021 ch. 699, § 3.) In addition to the substantive changes, Assembly Bill No. 333 added section 1109, which provides a new procedure for trying gang enhancements under section 186.22. (*E.H.*, at p. 478; Stats. 2021 ch. 699, § 5.) Our Supreme Court recently concluded that the ameliorative benefit of Assembly Bill No. 333's statutory amendments to section 186.22 applies to all cases not yet final on appeal. (*Tran*, at p. 1206.) However, the high court expressly declined to resolve the split of authority among the Courts of Appeal as to whether the new section 1109 applies retroactively. (*Tran*, at p. 1208 [declining to resolve split because any asserted error in failing to bifurcate was harmless].)

On appeal, defendant raises two claims under Assembly Bill No. 333. We address those claims in turn next.

A. *Substantive Changes to Section 186.22*

Defendant initially contends that the jury's true findings on the gang enhancements must be reversed due to the recent substantive changes to section 186.22. We agree.

1. *Statutory Framework*

Section 186.22 provides for enhanced punishment when a person is convicted of an enumerated felony committed "for the benefit of, at the direction of, or in association with a criminal street gang, with the specific intent to promote, further, or assist in criminal conduct by gang members." (186.22, subd. (b)(1).)

"Assembly Bill 333 made the following changes to the law on gang enhancements: First, it narrowed the definition of a 'criminal street gang' to require that

29

any gang be an 'ongoing, organized association or group of three or more persons.' [Citation.] Second, whereas section 186.22, former subdivision (f) required only that a gang's members 'individually or collectively engage in' a pattern of criminal activity in order to constitute a 'criminal street gang,' Assembly Bill 333 requires that any such pattern have been 'collectively engage[d] in' by members of the gang. [Citation.] Third, Assembly Bill 333 also narrowed the definition of a 'pattern of criminal activity' by requiring that (1) the last offense used to show a pattern of criminal gang activity occurred within three years of the date that the currently charged offense is alleged to have been committed; (2) the offenses were committed by two or more gang 'members,' as opposed to just 'persons'; (3) the offenses commonly benefitted a criminal street gang; and (4) the offenses establishing a pattern of gang activity must be ones other than the currently charged offense. [Citation.] Fourth, Assembly Bill 333 narrowed what it means for an offense to have commonly benefitted a street gang, requiring that any 'common benefit' be 'more than reputational.' " (*Tran, supra*, 13 Cal.5th at p. 1206, italics omitted.) Section 186.22, subdivision (g) now explains: "[T]o benefit, promote, further, or assist means to provide a common benefit to members of a gang where the common benefit is more than reputational. Examples of a common benefit that are more than reputational may include, but are not limited to, financial gain or motivation, retaliation, targeting a perceived or actual gang rival, or intimidation or silencing of a potential current or previous witness or informant."

        2. *Analysis*

The Attorney General concedes that the jury was not instructed on the elements to prove a gang enhancement as required following the enactment of Assembly Bill No. 333, but argues that reversal is unnecessary because it is clear beyond a reasonable doubt that the jury would have found true the gang enhancement allegations under the current version of section 186.22. We disagree.

When a jury does not determine all elements of a charged offense because the instructions omitted an element of the offense, the resulting prejudice is assessed under the standard set forth in *Chapman v. California* (1967) 386 U.S. 18, 24. (*People v. Flood* (1998) 18 Cal.4th 470, 491; *People v. Sek* (2022) 74 Cal.App.5th 657, 668.) We apply this same standard of review when the jury was not instructed on an element because trial occurred before the effective date of the amendment adding the element. (*Tran, supra*, 13 Cal.5th at p. 1207; *E.H., supra*, 75 Cal.App.5th at pp. 478-479.) Under the *Chapman* standard, the absence of instruction on the amended version of section 186.22 requires reversal unless "it appears beyond a reasonable doubt that the error did not contribute to th[e] jury's verdict." (*Flood*, at p. 504.) "The inquiry 'is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error.' [Citation.] This standard is much higher than substantial evidence review. For example, courts have found harmless error under the *Chapman* standard where the missing element from an instruction was uncontested or proved as a matter of law." (*E.H., supra*, 75 Cal.App.5th at p. 479-480.) But where " 'the basis of the jury's verdict is not so clear,' " such as where "the prosecution presented evidence of both financial and reputational benefit, 'we cannot rule out the possibility that the jury relied on reputational benefit to the gang as its basis for finding the enhancements true.' " (*Id.* at p. 480.)

On this record, we cannot conclude beyond a reasonable doubt that the jury would have reached the same result on the gang enhancements had it been instructed on the current version of section 186.22. Although there was *some* evidence suggesting that the predicate offenses were committed for the common benefit of the SMGB gang because gang rivals were targeted, this element was not proved as a matter of law. (See *E.H., supra*, 75 Cal.App.5th at p. 479 [where the prosecution presented evidence of both financial and reputational benefit, the omission was not harmless error].) Here, the prosecution was not required to prove, and the jury was not asked to find, that the

31

predicate offenses commonly benefitted the SMGB gang in a way that was more than reputational. And the prosecution's evidence and argument focused on reputational benefit to the gang, which is no longer permitted under the current version of section 186.22. Further, the jury was not asked to find that the most recent predicate offense was committed within three years of the charged offenses. And the jury was also permitted to consider the charged offenses in determining whether the prosecution had proven a pattern of criminal gang activity.

Even if we were to agree with the Attorney General that there is evidence in the record supporting a true finding on the gang enhancements under the current version of 186.22, we cannot uphold the jury's findings on this basis. "To rule that the existence of evidence in the record that would permit a jury to make a particular finding means that the jury need not actually be asked to make that finding would usurp the jury's role and violate [the defendant's] right to a jury trial on all the elements of the charged allegations." (*People v. Lopez* (2021) 73 Cal.App.5th 327, 346; see *People v. Sek*, *supra*, 74 Cal.App.5th at pp. 668-669 [presentation of evidence that benefit to the gang was more than reputational does not rule out possibility that jury relied on reputational benefit as the basis for finding gang enhancements true].) Again, the question is not whether there is sufficient evidence to satisfy the standard of proof under the law as amended, but rather whether it is clear beyond a reasonable doubt that the verdict was not attributable to the error. We cannot reach that conclusion here.

Because we are unable to rule out the possibility that the jury relied on the reputational benefit to the gang as the basis for finding that the predicate offenses requirement was satisfied (as argued by the prosecutor in closing argument), or that the jury considered the currently charged offenses in determining that the pattern of criminal gang activity requirement was satisfied, we will vacate the gang enhancements and remand the matter to provide the prosecution with the opportunity to prove the gang enhancements under the law as amended, should it choose to attempt to do so. (See *E.H.,*

*supra,* 75 Cal.App.5th at p. 480 ["The proper remedy for this type of failure of proof–where newly required elements were 'never tried' to the jury–is to remand and give the People an opportunity to retry the affected charges"].)[10]

B.  *Section 1109*

As relevant here, section 1109, subdivision (a) requires a gang enhancement charged under section 186.22, subdivision (b) to be tried separately from the substantive offense(s) upon request from the defense.  (§ 1109, subd. (a).)  In enacting Assembly Bill No. 333, the Legislature explicitly found that "[g]ang enhancement evidence can be unreliable and prejudicial to a jury because it is lumped into evidence of the underlying charges which further perpetuates unfair prejudice in juries and convictions of innocent people," "California courts have long recognized how prejudicial gang evidence is," "[s]tudies suggest that allowing a jury to hear the kind of evidence that supports a gang enhancement before it has decided whether the defendant is guilty or not may lead to wrongful convictions," and that "[b]ifurcation of trials where gang evidence is alleged can help reduce its harmful and prejudicial impact."  (Stats. 2021 ch. 699, § 2.)

---

[10]  Because we have concluded that reversal of the gang enhancements and remand for their potential retrial is required, we need not and do not decide whether any of the other new elements of section 186.22 were, or were not, met and whether other aspects of the instruction given were erroneous.  Currently, there is a split of authority among the Courts of Appeal regarding whether predicate offenses may be committed solely by an individual gang member.  (Compare *People v. Delgado* (2022) 74 Cal.App.5th 1067, 1089 ["[T]he prosecution could meet [the requirement to show that two predicate offenses were committed on separate occasions or by two or more members] by proving two gang members individually committed the predicate offenses on two separate occasions or two gang members collectively committed two predicate offenses on the same date"] with *People v. Clark* (2022) 81 Cal.App.5th 133, 145-146, review granted Oct. 19, 2022, S275746 [pattern of gang activity may be established by "(1) two gang members who separately committed crimes on different occasions, or (2) two gang members who committed a crime together on a single occasion"].)  Recently, our Supreme Court expressly declined to resolve this split.  (*Tran, supra*, 13 Cal.5th at p. 1208.)

The parties dispute whether section 1109 applies retroactively and whether defendant's convictions must be reversed because the trial on the gang enhancement allegations was not bifurcated from the trial on the substantive charges. We need not decide whether section 1109 applies retroactively because even if we assume it does, defendant was not prejudiced by the failure to bifurcate.

As an initial matter, we reject defendant's contention that the failure to bifurcate constitutes structural error. Our Supreme Court recently concluded that the failure to bifurcate is subject to the *Watson* standard, unless the failure to bifurcate rendered the trial fundamentally unfair, in which case the *Chapman* standard applies. (*Tran, supra*, 13 Cal.5th at pp. 1209-1210 [applying *Watson* standard].) Because defendant has made no effort to show, and we do not see how, the prosecution's use of gang evidence rendered the trial fundamentally unfair, we will apply the *Watson* harmless error standard. (See *People v. Ramos* (2022) 77 Cal.App.5th 1116, 1131 [applying *Watson* standard]; *E.H., supra*, 75 Cal.App.5th at p. 480 [same].)

Applying that standard, we conclude defendant has failed to show prejudice. As we have explained, there was substantial compelling circumstantial evidence pointing to defendant as the perpetrator of the first and third shootings (e.g., firearm evidence), and an eyewitness identified him as the perpetrator of the third shooting. Further, some gang evidence was relevant to, and admissible, regarding the underlying charges, including defendant's intent and motive. (See *People v. Hernandez* (2004) 33 Cal.4th 1040, 1049 [gang evidence can help prove motive, specific intent, and other issues pertinent to guilt of the charged crime]; *People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1167 ["Gang evidence is relevant and admissible when the very reason for the underlying crime, that is the motive, is gang related"].) Indeed, the prosecution's theory was that defendant was a gang member who intentionally shot at the victims because they were rival gang members. The defense, for its part, did not dispute that defendant was in a gang or that the shootings were gang related. Rather, the defense claimed that the shootings were

34

perpetrated by other members of defendant's gang. Thus, gang evidence was relevant and admissible in a trial on the substantive offenses.

Defendant concedes that even if the gang enhancements had been tried in a bifurcated proceeding, the jury was "probably going to hear about much of the same gang evidence" in a hypothetical separate trial on the substantive offenses. Nevertheless, he insists that he was prejudiced by the failure to bifurcate because the evidence supporting his guilt was "underwhelming" and the jury's determination that he was guilty as charged did not "dispel the possibility of undue influence" from the gang evidence.

As we have explained, the evidence supporting defendant's guilt was not "underwhelming." And gang evidence may be properly admitted even where the defendant stipulates to membership in a gang and even where the prosecution may be able to establish disputed matters with other evidence. (*People v. Valdez* (2012) 55 Cal.4th 82, 134.) Thus, a defendant who concedes that "some" gang evidence would be admissible must identify and discuss specific items of evidence they believe should have been excluded in order to establish prejudice. (*People v. Coneal* (2019) 41 Cal.App.5th 951, 963-964 ["Absent an analysis of specific evidence, reference to volume alone is meaningless," and the defendant "fails to explain how he was prejudiced by this cumulative evidence."].) Defendant has failed to do so here.

Under the circumstances presented, we cannot conclude that it is reasonably probable defendant would have obtained a more favorable result had the gang enhancements been tried in a bifurcated proceeding.

V

*Sufficiency of the Evidence to Support Count Four*

In counts two and four, defendant was charged with being a felon in possession of a .40-caliber semiautomatic firearm in violation of section 29800, subdivision (a)(1). The information alleged that these offenses were committed on the same days as the first and third shootings. As described *ante*, the evidence adduced at trial showed that the .40-

35

caliber semiautomatic firearm found at Tundra Way was the only gun used by defendant in these shootings.

On appeal, defendant contends that one of his firearm convictions must be reversed because, while he possessed a firearm during both shootings, his continuous possession of the same firearm over a single period of time constituted only one violation of section 29800, subdivision (a)(1).  The Attorney General concedes the point.  We agree with the parties.

In relevant part, section 29800, subdivision (a)(1) provides:  "Any person who has been convicted of a felony . . . and who owns . . . receives, or has in possession or under custody or control any firearm is guilty of a felony.  The purpose of this prohibition is "to protect the public by denying firearms to felons, who are considered more likely to commit crimes with them." (*People v. Correa* (2012) 54 Cal.4th 331, 342.)

In *People v. Mason* (2014) 232 Cal.App.4th 355, the defendant was convicted of four counts of being a felon in possession of a firearm in violation of former section 12021.  (*Mason*, at p. 357.)  The prosecution proved that the defendant possessed the same firearm on four separate dates, corresponding to the dates of three shootings and the date the firearm was recovered after he dropped it while fleeing from the police.  (*Id*. at pp. 363-364.)  The appellate court reversed three of the four convictions because "there was no evidence that [the defendant's] possession of the firearm was anything but continuous over the period encompassing the four dates." (*Id*. at p. 366.)  The *Mason* court explained:  "The Supreme Court has recognized that possession of a firearm by a felon is a continuing offense."  " 'In the case of continuing offenses, only one violation occurs even though the proscribed conduct may extend over [an] indefinite period.' [Citations.]  Thus, our Supreme Court recognized more than 70 years ago that the Deadly Weapons Act, from which former section 12021 [and now section 29800 were] derived, 'does not provide that it is an offense for each day that the ex-convict is in possession of

36

the weapon. . . .' " (*Id*. at p. 365; see § 29800 [continuing former § 12021 without substantive change], Stats. 2010, ch. 711, § 6.)

Here, defendant was convicted of multiple counts of violating section 29800, subdivision (a)(1) based on his possession of the same firearm on separate dates. As in *People v. Mason*, *supra*, 232 Cal.App.4th 355, there is no evidence establishing that his possession of the firearm was anything but continuous between the time of the first and third shootings. We therefore will reverse the second firearm conviction--count four.

VI

*Senate Bill No. 567 and Assembly Bill No. 124*

The parties agree, as do we, that the matter must be remanded for resentencing due to recent changes in the determinate sentencing law effectuated by Senate Bill No. 567 and Assembly Bill No. 124, which retroactively apply to defendant because they have the potential to lessen the punishment for his crimes. (See *People v. Flores* (2022) 75 Cal.App.5th 495, 500; *People v. Gerson* (2022) 80 Cal.App.5th 1067, 1095; *People v. Frahs* (2020) 9 Cal.5th 618, 629.)

Effective January 1, 2022, Senate Bill No. 567 and Assembly Bill No. 124 amended section 1170, subdivision (b). (*People v. Flores*, *supra*, 75 Cal.App.5th at p. 500; *People v. Gerson, supra,* 80 Cal.App.5th at p. 1095.) Under current law, a sentencing court may not impose a prison sentence exceeding the middle term unless the facts supporting the aggravating circumstances are (1) established by the defendant's stipulation to them, (2) proven to a jury (or to a court, if a jury is waived) beyond a reasonable doubt, or (3) based on prior convictions evidenced by a certified record of conviction. (§ 1170, subd. (b)(1)-(3).) Assembly Bill No. 124 also added a provision that requires a sentencing court to impose the low term if the defendant's psychological, physical, or childhood trauma was a contributing factor in the commission of the offense, or the defendant was a "youth" (under 26) as defined under subdivision (b) of section 1016.7, "unless the court finds that the aggravating circumstances outweigh the

37

mitigating circumstances [so] that imposition of the lower term would be contrary to the interests of justice." (§ 1170, subd. (b)(6).) Even where there is no evidence that the circumstances listed in subdivision (b)(6) of section 1170 are present, the trial court retains discretion to impose the lower term. (§ 1170, subd. (b)(7).)

At sentencing, the trial court selected count one, assault with a semiautomatic firearm (§ 245, subd. (b)), as the principal term and imposed an upper term sentence of nine years, which was doubled due to the strike prior. The trial court also imposed an upper term sentence on the attached firearm enhancement (§ 12022.5, subd. (a)), plus five years for the gang enhancement (§ 186.22, subd. (b)(1)). In so doing, the court cited several aggravating circumstances. (See Cal. Rules of Court, rule 4.421.) However, none of those circumstances were admitted, proven beyond a reasonable doubt, or involved prior convictions evidenced by a certified record of conviction. Further, the record reflects that defendant was 19 years old--a youth--at the time of the events giving rise to the charges in this case, and there were statements made at sentencing indicating that childhood trauma may have been a contributing factor in the commission of the offenses. Prior to imposition of sentence, defendant's godmother told the trial court that defendant had a "very rough life," including being placed in foster care at the age of nine following the death of his mother.

Given the recent amendments to the determinate sentencing law, we will vacate defendant's sentence and remand for full resentencing. Under the full resentencing rule, "when part of a sentence is stricken on review, on remand for resentencing 'a full resentencing as to all counts is appropriate, so the trial court can exercise its sentencing discretion in light of the changed circumstances.' " (*People v. Buycks* (2018) 5 Cal.5th 857, 893.) Accordingly, we need not and do not address defendant's claims of sentencing error and ineffective assistance of counsel related to sentencing. Nor do we consider defendant's contention that remand is required under *People v. Tirado*, *supra*, 12 Cal.5th 688, to allow the trial court to consider striking the section 12022.53,

subdivision (d) firearm enhancement and imposing a less severe enhancement. Defendant will have the opportunity to raise these issues anew in the trial court. At resentencing, the trial court has the discretion to reexamine any aspect of defendant's sentence.

## DISPOSITION

The judgment is reversed as to defendant's conviction on count four (§ 29800, subd. (a)), and the jury's true findings on the gang enhancements (§ 186.22) are vacated. Defendant's sentence is vacated and the matter is remanded. The judgment is otherwise affirmed.

On remand, the trial court shall give the prosecution the opportunity to retry the gang enhancements under the current version of section 186.22. If the prosecution elects not to retry defendant, or at the conclusion of any retrial, the trial court shall conduct a full resentencing, where it will have the discretion to reexamine all aspects of defendant's sentence in light of any new law that applies to him.


    /s/
    Duarte, Acting P. J.


We concur:



    /s/
Renner, J.



    /s/
Boulware Eurie, J.